M. R. GODLEY, Plaintiff,

v.

PIEDMONT LAND SALES, INC. et al., Defendants.

Civ. A. No. 75–400.

United States District Court,
E. D. Kentucky,
Pikeville Division.

Sept. 11, 1978.

John H. Burrus, Weldon Shouse, Shouse & Burrus, Lexington, Ky., for plaintiff.

Dale Cleland, Pittsburgh, Pa., Amos Eblen, Lexington, Ky., for Kentucky Resources Corp.

William P. Sheffield, Abingdon, Va., for Piedmont Land Sales and Hugh and Donna Rakes.

## MEMORANDUM OPINION

HERMANSDORFER, District Judge.

This is a diversity action, 28 U.S.C. § 1332, in which the plaintiff challenges, on the grounds of fraud, the validity of certain documents purporting to transfer interests in Kentucky real property and seeks to quiet title. The land in question includes about twenty-four thousand seven hundred (24,700) acres situated in Knott, Perry and Breathitt Counties, Kentucky, and is sometimes referred to as one hundred and twenty (120) tracts of two hundred (200) acres each.[1]

The case was heard without the intervention of a jury by agreement of the parties. It is noted at the outset that there are factual complexities in this case—the principal litigants, plaintiff M. R. Godley and defendant Hugh Rakes, are men of advanced years, and each of them demonstrated an ambivalent memory during his testimony. Great care has been afforded the consideration of their testimony in court and by deposition, but no amount of accommodation can stand as a substitute for evidence of probative value. The factual difficulties extend further because all parties have shared the common assumption that defendant Piedmont Land Sales, Inc. [Piedmont] originally possessed some vested, merchantable title to the Kentucky real estate. This unchallenged assumption constituted the underlying factual predicate upon which the action was tried. Nevertheless, there is a suggestion in the record that non-litigant third parties have been in actual possession of some of the land for three generations. Accordingly, this Court does not express any opinion or determine any issue of title except as between the parties

---

1. The land involved is also referred to, at various places in the record, as one hundred and eighteen (118) tracts, one hundred and nineteen (119) tracts, and one hundred and twenty-two (122) tracts. The evidence supplies no resolution to the apparent disparity in descriptions, but no issue is presented as to location, boundaries, or quantity of land purportedly transferred.

in litigation. This Opinion will focus on the legal sufficiency of certain documents to convey whatever title, if any, might be involved. In short, this litigation has much the flavor of a spirited checker game played on the lawn of a rural Kentucky courthouse on a summer afternoon—one must stay alert to know where the checkers went.

■ The differences between Godley and Rakes have been presented to the Knott County Circuit Court in Civil Actions 3191 and 3213 which were consolidated and dismissed with prejudice on April 10, 1974. Normally, that circumstance would preclude further litigation in this Court, *Sedley v. City of West Buechel*, Ky., 461 S.W.2d 556 (1970); but the overriding policy considerations inherent in the reliability of public real estate records mandate that the salutary doctrine of issue preclusion not be applied in this instance. Application of the doctrine in this case would leave the public records in three (3) Kentucky counties as to a vast acreage in a bewildering state of confusion.

## I. FACTS

Rather than trying to set forth the multitude of occurrences testified to chronological order, I will analyze separately two (2) series of related transactions. Differences between execution dates of instruments and the dates they were recorded—considering the intervening acts—prevent any meaningful chronological statement. It can be said that the principal, relevant time period commences in the winter of 1972 and terminates about January, 1974, although some subsequent transactions are considered.

### A. First Series:

### Deed of Trust Transactions

On January 21, 1972 Piedmont executed a deed of trust purporting to convey to Robert Morgan, as trustee, eighty-four (84) tracts of two hundred (200) acres each.[2] Hugh Rakes, the dominant force in Pied-

mont, failed, however, to advise Robert Morgan that he was to act as trustee. Mr. Morgan did not accept any trust duties, and he was unaware of the existence of the deed of trust until he ran across it in the indicies to public records in the Knott County Clerk's office (Deposition, Robert Morgan, 2/18/76, pp. 4, 5, 6, 7). There is no evidence that any documents were ever delivered to the purported trustee. To the contrary, the evidence shows that Rakes kept a secure hand on the documents which normally would have been with the trustee and had them when he went to see G. L. Whitlow, the ostensible beneficiary of the deed of trust who died during the pendency of this action. The trust document reveals that the eighty-four (84) tracts of land were to secure a Seven Million ($7,000,000.00) Dollar note payable to Mr. Whitlow. Mr. Whitlow testified by deposition that Rakes did not owe him Seven Million ($7,000,-000.00) Dollars, and related that Rakes brought him some papers which he signed and for which he received no consideration. One of these documents was a release of the deed of trust under date of February 1, 1972 (Deposition, G. L. Whitlow, 2/17/75, pp. 60, 61, 62, 63). The release was recorded on October 3, 1972.

After Robert Morgan learned that he was designated trustee in the Whitlow deed of trust, he contacted Rakes to have him do something about it. On June 4, 1973 Rakes took some papers to Morgan's office—Morgan was the Knott County Attorney—which Morgan signed. The document so executed was Morgan's appointment of John Jackson of Pikeville, Kentucky as substitute trustee (Morgan deposition, pp. 8, 9). The evidence shows that no one knew John Jackson. Although Morgan said Rakes brought him the papers, Rakes claimed that he did not know John Jackson because it was Morgan's responsibility to select and appoint the substitute trustee (Deposition,

---

**2.** The deed of trust is not a commonly used device in Kentucky. The provisions of Kentucky Revised Statute 381.190 indicate a policy against non-judicial sales, although the existing case law admits of many exceptions. *See, But-*

*ler v. Dillehay Brick Co.'s Trustee*, 187 Ky. 224, 219 S.W. 154 (1920). No question is presented as to the efficacy *per se* of a deed of trust in Kentucky under the circumstances of this case and the matter will not be pursued.

Hugh Rakes, 6/26/76, pp. 53, 54). Morgan testified that he did not know John Jackson (Morgan deposition, p. 7).

On July 23, 1973 John Jackson, as substitute trustee, purported to sell to Piedmont at public auction, as the highest and best bidder for cash in hand, one hundred and nineteen (119) tracts[3] of Kentucky real estate for Two Million ($2,000,000.00) Dollars. Mr. Rakes testified that he was not present at the sale but gave Bob Bales, a named defendant who is not before the Court, a check for Two Thousand ($2,000.00) Dollars and sent him to Hindman, Kentucky to attend the sale (Tr.Evid. p. 202). Mr. Bales testified by deposition that he bid the property in for Two Million ($2,000,000.00) Dollars (Deposition, Bob Bales, 11/19/75, p. 138). Piedmont then conveyed the property by special warranty deed to J. E. Berry and Mack Wyatt on October 2, 1973, who in turn reconveyed the property to Piedmont on December 10, 1973. On December 11, 1973 Piedmont conveyed the property to Kentucky Resources, Inc. which simultaneously made a deed of trust to Thomas J. Surface, an attorney, as trustee to secure a Three Million Two Hundred Thousand ($3,200,000.00) Dollar note payable to Piedmont.

## B. Second Series:

### Transactions of M. R. Godley

█ Sometime in February of 1972 the defendant Hugh Rakes approached the plaintiff M. R. Godley for the purpose of securing Ninety Thousand ($90,000.00) Dollars with which to pay off a then due note owed to one Paul Mullins. What occurred in the negotiations is unclear. But on February 23, 1972, Godley went to his bank, secured a check payable to himself and Piedmont jointly for the required sum, and delivered the endorsed check to Rakes (Plaintiff's Exhibit 2). The evidence supports a finding that Rakes had shown Godley a title insurance policy on the Kentucky property. Mr. Rakes admits this policy was recalled by the issuing company. Mr. Rakes also displayed to Godley the release

of the deed of trust executed by G. L. Whitlow.

For the Ninety Thousand ($90,000.00) Dollars Rakes delivered to Godley two (2) special warranty deeds prepared by Rakes's attorney. In the aggregate these two (2) deeds purported to convey an undivided one-half (½) interest in one hundred and twenty (120) tracts of Kentucky real estate. The deeds bear a date of February 22, 1972 (Plaintiff's Exhibits 3a, 3b) and were recorded by Godley on June 5, 1972. Godley contends the Ninety Thousand ($90,000.00) Dollars was the purchase price of the interest in the Kentucky property. Rakes claims that the money had nothing to do with the Kentucky property but was consideration for a promissory note in the face amount of Ninety Thousand ($90,000.00) Dollars from Kona Mining Company signed by John Graham [Graham note]. It is undisputed that the note (Plaintiff's Exhibit 5) bears a making date of August 24, 1972. There is no evidence tending to show that the Graham note was in existence in February 1972; there is evidence supporting the fact that the money paid was for the Kentucky real estate. Rakes testified that he signed the two (2) deeds after he got the money from Godley (Tr.Evid. pp. 113, 114). The position of Mr. Rakes is further eroded by his assertion that the two (2) deeds were security for a vaguely described loan of between Twenty Thousand ($20,000.00) Dollars and Thirty Thousand ($30,000.00) Dollars (Tr.Evid. pp. 179, 180) about which the evidence is otherwise silent.

Before Godley took delivery of the two (2) deeds there was on record at the Knott County Court Clerk's office a mineral lease from Piedmont, as lessor, to lessees John Graham and his brother, L. D. Graham. As noted *infra*, there has been a failure of proof as to mineral ownership; but whatever interest in the real estate Godley took on February 23, 1972 was subject to the Graham lease.

---

3. There is no explanation in the evidence as to how a purported deed of trust conveying

eighty-four (84) tracts supports an out conveyance of one hundred and nineteen (119) tracts.

The next transactions between Godley and Rakes material to this case occurred in October, 1972. On October 3rd, Rakes recorded the Whitlow release of the deed of trust. On the same day Godley recorded a third deed to the Kentucky property, dated February 23, 1972, which purported to convey to him (Godley) an undivided one-half (½) interest in one hundred and twenty-two (122) tracts of land.[4] Mr. Rakes gave Godley Piedmont's check of Thirty-Six Thousand ($36,000.00) Dollars on October 8th, and on the 10th Godley gave Rakes his check for Thirty-Six Thousand ($36,000.00) Dollars. At the time Godley delivered his check, Rakes executed a notarized statement (Plaintiff's Exhibit 9), which provided that Rakes would have until October 16, 1972 to purchase an undivided one-half (½) interest in the Kentucky property for Thirty-Six Thousand ($36,000.00) Dollars; otherwise, title to the land would "revert" to Godley (Plaintiff's Exhibit 9).[5] The evidence does not satisfactorily synthesize these contradictory elements of the Rakes statement, and the confusion is furthered by Rakes's insistence that Exhibit 9 was modified to reflect that Godley was holding the first two (2) deeds as security (fourteenth unnumbered exhibit, exhibit section, November 1975 deposition volume).

There is no evidence to support a finding, over Godley's denial of his signature and in light of the weight of the other evidence, that the unnumbered exhibit is credible. Although the document purports to bear the signature of M. R. Godley, no testimony was presented tending to establish that it was, in fact, signed by M. R. Godley. Curiously, the defendant Rakes had little to say about the third deed to Godley although it is clear from the document that it was prepared by Rakes's attorney.

### C. The Mineral Estate

■ There is simply not sufficient evidence for the Court to determine, as between the parties, the ownership of the mineral estate underlying the Kentucky property. To the extent that any party in this litigation has the burden of proof as to this aspect of the case I conclude that such party has failed to carry that burden by a preponderance of the evidence. The evidentiary lapse is outlined by the following brief description of the mineral estate transactions.

On November 24, 1971, before Godley was involved in his first transaction with Piedmont, Piedmont executed a mineral lease to John Graham and L. D. Graham. This lease was recorded on February 2, 1972 (Plaintiff's Exhibit 12).

On January 1, 1972 Piedmont assigned to J. E. Berry the beneficial interests accruing from such lease (Plaintiff's Exhibit 13) which document was recorded on November 1, 1972. Thereafter on December 1, 1972 Piedmont leased the coal under the Kentucky property to J. E. Berry ". . . subject to all rights, estates, easements and agreements and privileges pertaining to said land heretofore granted by the Lessors . . ." (Plaintiff's Exhibit 14). Mr. Berry reconveyed all interests to Hugh Rakes (Plaintiff's Exhibit 15). The Piedmont-to-Berry and the Berry-to-Rakes documents were recorded on July 18, 1973.

On March 3, 1977 the Grahams assigned their lease to Clinton Coal Company [Clinton], a Rakes corporation. Piedmont joined in this assignment. On June 14, 1977 Clinton assigned its rights under the March 3rd instrument to defendant W. H. Goff. Both of these documents were recorded on September 20, 1977. No further transaction touching the mineral leases is contained in the evidence.

There does not appear to be any dispute in the evidence as to the validity of the Graham lease. It follows, upon the evidence before me, that there was no legal or

---

4. As noted in footnote 1, *supra*, the discrepancy in the number of tracts is unexplained in the evidence. The first two (2) deeds conveyed one hundred and twenty (120) tracts.

5. The land could "revert" to Godley only if Godley had conveyed it to Rakes. When construed alongside the deeds previously recorded to Godley, Exhibit 9 must be considered an option in Rakes to redeem land he had conveyed to Godley.

equitable limitation upon the Grahams doing with their property rights as they chose. Since Godley did not become involved until after the Graham lease was recorded, Godley has no apparent basis to contest the conclusion that he took the Kentucky property subject to the Graham lease. The evidence is silent as to whether Godley had notice of the assignment of beneficial interests pertaining to the lease made by Piedmont. Assuming Godley took subject to the lease, it is apparent that Berry thought he still possessed an interest in the coal. Referring to his deposition to the mineral lease, he said "[i]t ain't supposed to be released" (Berry deposition, p. 123). The issues thereby engendered were not developed.

Upon the evidence I can only determine that Godley took surface rights and questionable interests in the underlying mineral estate which, at best, are subject to the Graham lease presently held by the Grahams' successors in interest. Beyond this, nothing herein should be construed as an attempt to determine ownership of the mineral rights.

## II. CONCLUSIONS

■ I find that Rakes engaged in acts of intentional misrepresentation by displaying the title insurance policy and the release of the Whitlow deed of trust to Godley. However, Godley has failed to establish that he was injured in that transaction; he, therefore, has failed to establish a *prima facie* case of civil fraud. For actionable fraud to exist there must be a showing of intentional misrepresentation *and* resulting injury. *Lashley v. Lashley*, 205 Ky. 601, 266 S.W. 247 (1924); *Miles v. Proffitt*, Ky., 266 S.W.2d 333 (1954). Any injury suffered by Godley arose, not from Rakes's misrepresentations to Godley, but from Rakes's subsequent transactions with other purported grantees. *O'Brien v. Marvin*, Ky., 387 S.W.2d 282 (1965). Nevertheless, Godley has clearly established the existence of clouds on title to the subject property.

Godley has some claim to title and no remedy at law by which his title can be cleared. Under these circumstances, the Court may and should, exercising its equity powers and applying the law of Kentucky, quiet title to the extent possible on the evidence. *Elk Horn Coal Corp. v. Anderson Coal Co.*, 223 F.Supp. 746, 748 (E.D.Ky. 1963).

### A. The Deeds of Trust

■ The purported deed of trust from Piedmont to Robert Morgan represented by the document dated January 21, 1972 was void *ab initio*. A trust deed recorded without the knowledge or consent of the trustee cannot pass title.[6] *Hinton's Ex'r v. Hinton's Committee*, 256 Ky. 345, 76 S.W.2d 8 (1934). Under the testimony of Robert Morgan that he was unaware of his alleged status of trustee, it follows that there was no delivery to him of any trust deed. Though recorded, an undelivered deed is ineffectual to pass title to the trustee. *Sullivan v. Bland*, 215 Ky. 57, 284 S.W. 410 (1926). Further, it is clear under the teaching of *Cotton v. Graham*, 84 Ky. 672, 2 S.W. 647 (1887), that a mortgage given to secure a non-existent obligation is unenforceable and is at least voidable. Nothing in the record even suggests that the Seven Million ($7,000,000.00) Dollar note alleged to be owed to G. L. Whitlow was valid. I find the note to be a pure sham—it was from its inception evidence of a non-existent obligation. The note will not support a viable security arrangement involving Kentucky real estate, even as between the original parties. *See, Shepherd v. Hill*, Ky., 243 S.W.2d 1016 (1951).

I find no evidence that John Jackson, substitute trustee, ever existed. Upon the record he is a figment of Hugh Rakes's imagination—a fictitious straw man incapable of executing any document. No credible witness before this Court ever saw him; neither Rakes nor Morgan admitted to any knowledge of him.

---

**6.** As noted in footnote 2, *supra*, the deed of trust is not common in Kentucky, and for that reason resort must be had to older cases.

There are no current Kentucky cases dealing with deeds of trust applicable to the instant litigation.

Accordingly, I find the following instruments which were recorded in Knott County, Kentucky and, suggestively, in Perry and Breathitt Counties, Kentucky, to be utterly void and of no legal effect:

(1) A deed of trust from Piedmont to Robert Morgan dated January 21, 1972 and recorded on February 16, 1972 in Mortgage Book 23 at page 506, Knott County Court records.

(2) A deed of trust release from G. L. Whitlow dated February 1, 1972 and recorded October 3, 1972 in Mortgage Book 23 at page 624, Knott County Court records.

(3) An appointment of a substitute trustee, Robert Morgan appointing John Jackson, dated June 4, 1973 and recorded September 26, 1973 in Deed Book 96 at page 407, Knott County Court records.

(4) A deed from John Jackson, Trustee, to Piedmont dated July 28, 1973 and recorded September 26, 1973 in Deed Book 96 at page 406, Knott County Court records.

(5) A deed from Piedmont to J. E. Berry, et al., dated October 2, 1973 and recorded October 17, 1973 in Deed Book 96 at page 429, Knott County Court records.

(6) A deed from J. E. Berry, et al., to Piedmont dated December 10, 1973 and recorded December 14, 1973 in Deed Book 96 at page 533, Knott County Court records.

### B. The Godley Instruments

The testimony of Godley and Rakes, which is the key to adequately understanding the parties' intent in transferring documents and paying (or purporting to pay) large sums of money, cannot be reconciled. It is clear that the first relevant contact between Godley and Rakes was marked by the delivery of the deeds prepared by Rakes's attorney. I find that Rakes was knowledgeable about real estate devices—he had secured the release of a deed of trust only two (2) days before he accepted the money from Godley, and had created the deed of trust initially about one (1) month before that date. Except for the argument of counsel there is nothing in this record supporting Rakes's contention that the first two (2) deeds were for security

purposes. There is no note from Rakes or Piedmont to Godley. There is no contemporaneous writing between them. There is no evidence as to the fair value of the lands. No basis is shown as to any reason that Godley would loan Rakes Ninety Thousand ($90,000.00) Dollars as opposed to making a purchase from him. Indeed, the evidence shows that Rakes was in a tight financial position. The Paul Mullins note was due, and Rakes could not pay it. Considering the fact that Godley was an experienced trader and auctioneer, it becomes highly improbable that he would be content to substitute himself for Mullins as a creditor of Rakes. I am convinced that there was no mistake on the part of either Godley or Rakes as to the character of the documents delivered to Godley—they were special warranty deeds of conveyance prepared by Rakes with the intent that they convey to Godley an undivided one-half (½) interest in the Kentucky real estate. Accordingly, I hold that the first two (2) instruments passing from Rakes to Godley, contrary to the arguments of Rakes and Kentucky Resources, were intended as conveyances in fee simple rather than as security instruments.

What occurred in October, 1972 is less clear, but it is possible to determine the intent of the parties by a preponderance of the evidence. I find that in early October, Rakes needed additional money and went to Godley. The evidence reflects Godley was concerned that Rakes had not recorded the Whitlow release of the deed of trust, and I am satisfied that he set out the terms and conditions under which Rakes would get more money from him. The October 3rd recordings of the release of the deed of trust and the third deed to Godley were, inferentially, the predicate for the subsequent dealings. The delivery by Rakes to Godley of the Piedmont check for Thirty-Six Thousand ($36,000.00) Dollars, which I find Godley knew was not good at that time, is understood in terms of Plaintiff's Exhibit 9 giving Rakes a redemption right. Godley was purchasing the remaining undivided one-half (½) interest in the Kentucky

property but was willing to give Rakes a period to repurchase the land. Godley also sought by the same writing to secure a termination to any claim by Rakes in the Kentucky land upon the lapse of the redemption period. There is no attack made on the genuineness of the redemption agreement or the fact it was notarized. Rakes realized after he had signed the document what Godley had succeeded in doing and became concerned. By his testimony he went back to Godley's office and secured the modification of the agreement noted above (Tr.Evid. p. 184). The alleged modification, however, if believed, would have changed the entire character of Godley's dealings with Rakes. The weight of the probative evidence favors Godley's position against the validity of the alleged modification. It is noted that the alleged modification was prepared on a copy, and the original presented in evidence by Godley bears no such modification.

The evidence demonstrates that Godley did not desire to be a creditor of Rakes. Since Rakes prepared or caused to be prepared all of the documents exchanged between them except for the Redemption agreement and Godley's checks, I am satisfied that Rakes knew the character of the documents and was not misled in understanding that he was selling interests in real estate as opposed to securing debts by real estate. The several arguments advanced by Rakes have been carefully considered in terms of the evidence and the circumstances of the case. None of these arguments, in my opinion, are supported by a preponderance of the evidence.

There is no satisfactory explanation in the record as to how or under what circumstances Godley came into ownership of the Graham Ninety Thousand ($90,000.00) Dollar note. I do not believe upon this record that the note was in existence in February 1972, the time Rakes contends the note was sold to Godley. There is no suggestion as to why Mr. Graham would date a note other than upon the date it was made or any other circumstance tending to establish its making on any other date than the one shown. There is no doubt, however, that the debt referred to in Godley's letters to Rakes and Graham (Defendants' Exhibits 1, 2, and 3) having a due date of February 20, 1973 is the Graham note. The time between August 24th and February 20th is one hundred and eighty (180) days, the term of the note. There simply has been a failure of proof as to the circumstances under which Godley came into ownership of this note. I find the face amount of the note insufficient, in and of itself, to warrant the making of any inference relating this note to the other salient transactions between Rakes and Godley.

I find the third deed from Piedmont to Godley was intended to be a deed of conveyance as is shown by the face of the document. I further find that Rakes had a period of redemption in which to repurchase that interest from Godley for the same amount Godley paid for it. Accordingly, I do not find the disparity in purchase prices between the February transactions and the October transaction to be material to any security agreement. The circumstance reinforces the conclusion that Godley was not willing to become a creditor of Rakes and supports the sale aspect of the first two (2) deeds. The October transaction was a sale with redemption rights and emphasizes again that Godley would deal only in title and not in a security arrangement. Thus, I find that Godley, as of October 10, 1972 (the recordation date of the last Piedmont-to-Godley deed), took all title which Piedmont ever had to the real estate in question; subject only to the outstanding mineral interests of the Grahams and their successors in interest.

### C. The Subsequent Purported Conveyances

█ Finally, I find that Kentucky Resources, Inc. did not take title to any interests in the Kentucky real estate because, at the time Piedmont purported to deed the land to Kentucky Resources, December 12, 1973, Piedmont had no title to convey. All of Piedmont's interests had been conveyed to Godley; and Godley had recorded his deeds on June 5, 1972 and on October 10,

1972. KRS 381.150; *York v. Perkins*, Ky., 269 S.W.2d 242 (1954); *Pope v. Kirk*, Ky., 255 S.W.2d 468 (1953). Accordingly, the following instruments I find to be utterly void and without legal effect:

(1) A deed from Piedmont to Kentucky Resources, Inc. dated December 11, 1973 and recorded December 14, 1973 in Deed Book 96 at page 534, Knott County Court records.

(2) A deed of trust from Kentucky Resources to Thomas J. Surface, Trustee, dated December 11, 1973 and recorded April 29, 1974 in Deed Book 97 at page 456, Knott County Court records.